[No. 1637.]

BEN. W. GILLY *v.* THE STATE.

1. JUSTIFIABLE HOMICIDE.—The Penal Code of this State permits homicide
   not only for the prevention of murder, rape, robbery, maiming, disfig-
   uring, or castration, but also for the protection of the person against any
   other "unlawful and violent attack;" and in no case is the assailed
   party bound to retreat in order to avert the necessity of killing his as-
   sailant.
2. SAME.—When the homicide is committed for the prevention of any of the
   offenses above named, the slayer need resort to no means whatever to
   avoid the necessity of killing, but may kill at once. And in like man-
   ner, if the "unlawful and violent attack" be such as produces a reason-
   able expectation or fear of death or some serious bodily injury, the as-
   sailed party may kill promptly and without resorting to any means of
   avoidance.
3. SAME.—If, on the other hand, the "unlawful and violent attack" be not
   such as to produce a reasonable expectation or fear of death or some se-
   rious bodily injury, then the assailed party, though not bound to retreat,
   as above stated, is bound to resort to all other reasonable means for the
   prevention of the injury, and the killing must take place while the per-
   son killed is in the very act of making the unlawful and violent attack;
   otherwise the homicide will not be justifiable.
4. CHARGE OF THE COURT—PRACTICE IN THE COURT OF APPEALS.—If no
   exceptions were reserved to the charge of the court below, and no addi-
   tional instructions were asked, defects or errors in the charge are not
   cause for reversal unless this court concludes that they may have preju-
   diced the rights of the defendant upon his trial before the jury.
5. SAME—FACT CASE —Note the state of proof in view of which this court
   sustains a conviction for murder in the first degree, and declines to set it
   aside on account of defects in a charge to which no exception was taken
   in the trial court.

APPEAL from the District Court of Wood. Tried below before
the Hon. Felix J. McCord.

In December, 1881, the grand jury of Wood county presented
an indictment against the appellant for the murder of Hugh
Moore, on the first of August, 1881, by shooting him with a shot
gun. At the autumn term, 1883, a trial was had, which resulted
in the conviction of appellant for murder in the first degree, and
the assessment of his punishment at a life term in the peniten-
tiary.

Mrs. A. Moore, the widow of the deceased, was the first witness introduced by the State. She testified that her husband, Hugh Moore, was killed on August 6, 1881. She had known the defendant for several years. In the afternoon of Friday, August 5, 1881, Hugh Moore left his home to take to Mineola, which was his market town, about eleven miles distant, four bales of cotton, which he had left at the gin. He took with him two wagons and teams, and was accompanied by Sam. McGehee and Ambrose George, two men who were living with him. The next day, late in the afternoon and nearly night, the witness, having been notified of the difficulty, went and met her husband, Hugh Moore, who was being hauled home in his wagon by Sam McGehee. He died in a few minutes after she reached him, and without being able to speak to her. The wound was in his right side, and was a very large one. Mr. Moore was about thirty-five years old at the time of his death.

D. T. Heath, for the State, testified that in the spring of 1881 he ran a tie camp within two miles of the camp of Gilly, the defendant, who was also in the tie business. In April, 1881, witness and Pat. Lyson went by the defendant's camp, and stopped there about an hour. Defendant was drinking, and he offered liquor to witness and Lyson, who drank with him. Then the defendant, addressing himself to the witness, said: "I suppose you are living on Hugh Moore's place;" to which the witness replied that he was not, but was living at his tie camp, near Hugh Moore's place. The defendant then remarked: "He's a d—d rascal, and I intend to kill him if I ever get a good chance. He's got a yearling running at my house, and I'll give you ten dollars to get him to come after it." (The defendant's house was a mile or two from his tie camp.) Witness replied that he would not do it. Defendant then went into his tent, and soon returned with a shot gun and a pistol, and said he had them to use on Hugh Moore. As defendant started out of the tent, the witness heard a woman inside say: "Oh, Mr. Gilly, don't do that." Witness could not say who the woman was, as he did not see her.

On his cross-examination, the witness stated that John Jones, of Mineola, was the first person who informed him of the killing of Hugh Moore by the defendant, and the first person whom witness told about the threats he had heard the defendant make against the deceased. Witness had since told several other persons about them. He did not want to hear the threats, and was

sorry he ever heard them. When they were made, the defendant's son Tom, Jim Jones and others were close by, but witness did not know whether they heard the threats or not. Witness remembered talking with H. W. Mohuran about the threats, but denied telling him that it was the defendant's wife who spoke to defendant in the tent, and told him "Don't do that." Witness repeated that he did not see the lady, and did not know who she was.

Ambrose George, for the State, testified that he was twenty-two years old, and lived with Hugh Moore at the time he was killed by the defendant. Witness saw the killing. On Friday, August 5, 1881, Hugh Moore, Sam. McGehee and witness went to Mineola with two loads of Moore's cotton. They went the main and only road from Moore's to Mineola, and camped that night about a mile from town. The next morning they went into town, and some time after reaching there the witness saw the defendant there, who had also come in a wagon. During the day witness saw the deceased and the defendant several times, but did not see them meet each other. Early in the afternoon witness noticed the defendant leave town. Where the deceased then was, the witness could not say. About two or three hours before sundown, the deceased, Sam. McGehee and witness started homeward by the same road they had come. Deceased and McGehee rode in the foremost wagon, and witness drove the other one in rear of them. About nine miles from Mineola, when deceased and McGehee were driving along just in front of the witness, the defendant, on horseback, emerged from the woods on the right, and crossed the road in front of the wagon driven by deceased and McGehee. As he got by the side of their team he raised his gun into a shooting position and shot Hugh Moore, the deceased. As the defendant fired, McGehee grabbed his coat, which was lying in the wagon, and jumped out of the wagon, and as he did so the deceased returned the fire almost simultaneously. McGehee, on getting out of the wagon, fired four or five shots at the defendant as the latter rode off into the woods. The defendant fired at McGehee as the latter jumped from the wagon. Between the defendant's second shot and McGehee's shots the deceased fired at the defendant twice, and then fell over in the wagon and never spoke afterward. Just as the defendant raised his gun in a shooting attitude either the deceased or McGehee exclaimed "Don't shoot." McGehee received a wound in his left hand, his

19

hat was struck, and a shot passed through his hair on the side of his head. · When the defendant shot Moore, the latter reached forward and got his pistol from his saddle bags. Defendant's horse, when he shot Moore, was close by the side of Moore's mules. The shot made a big hole on the right side of Moore, near the waistband of his pants. Defendant's horse began to prance around when the first shot was fired. When McGehee was firing at defendant, the latter was trotting off at a quick gait through the woods. Defendant circled around to the road leading back toward Mineola, and witness saw no more of him. The shooting occurred at the top of a small hill leading from a ravine.

On his cross-examination the witness stated that he had lived with the deceased for five years before the latter's death. He had previously lived about eight years with Mrs. H. Adams, who principally raised him, and with whom he went to live when he was an orphan about seven years of age. McGehee's pistol was a small five shooter; the deceased's was a large forty-four calibre six shooter. Defendant used a double barreled shot gun. Witness thought it was McGehee who said "Don't shoot," but could not be positive whether it was the deceased or McGehee. Witness denied that he had ever told Sam. Sharp that the first shot was fired by deceased at defendant, and denied that he had ever so told Peter Whiteass or any one else.

Sam. McGehee, for the State, testified substantially to the same material facts as Ambrose George, the preceding witness. When witness and deceased got to the top of a small hill, witness saw the defendant close to the side of their team, with his gun presented; and the deceased said, "Don't shoot." The gun was fired toward them, and the witness jumped from the wagon, with his coat in his hand, and as he did so, the defendant fired at him. One of the shot struck witness's hand, across his thumb; another glanced his head, and a third went through his hat. When the defendant first made his appearauce, the deceased was driving, and he and the witness were talking. As the defendant fired, the deceased grabbed for his saddlebags, in which was his pistol. The firing all occurred in rapid succession. Witness did not see the deceased's first shot. Deceased's second shot was fired about the time the witness turned to shoot, after he got on the ground.

Cross-examined, the witness stated that he and the deceased, when they started to Mineola the day before the killing, took

their pistols with them, as was their usual habit when they went to that place. If Ambrose George took along a pistol, the witness did not know it, and had not heard of it. Witness did not hear the deceased say anything about the defendant on the day of the killing or the preceding day, and never heard the deceased threaten the defendant at all. Witness had learned that the deceased and the defendant were enemies, and had been enemies for several years; but he had never heard the deceased threaten to hurt the defendant in any way, nor try to hire any one else to shoot or hurt the defendant. When witness discovered the defendant, as the latter raised his gun, witness and deceased were sitting on the end of the mattress they had taken along to sleep on, and witness was leaning on his elbows, with his head somewhat behind the deceased, who was talking to witness, with his head turned toward him. The bed of the wagon came nearly to their shoulders. Witness was positive that the deceased said nothing and did nothing until the defendant raised his gun to shoot. The deceased did not shoot first, nor try to shoot first. Defendant presented his gun and fired very quick, and the shooting which ensued was very rapid. The deceased lived for perhaps half an hour after he was shot, but never spoke. Witness drove immediately home with him. The whole load of buck shot seemed to have entered the deceased in a wad, just about or above the waistband of his pants, on the right. Witness had seen John Preston, but denied that he had ever told John Preston or any one else that he, witness, and the deceased had shot at the defendant first. Witness knows William Green, who had worked at deceased's the spring before the killing, but did not remember hearing Green and the deceased talking at the house of the deceased when the latter was abusing the defendant; and witness positively denied that any conversation ever occurred between him and the deceased in which the latter proposed to give him five hundred dollars to kill the defendant, and to which the witness replied: "I'll do it; hand me your money." Witness stated that no such talk ever passed between him and the deceased, nor was anything of the kind ever mentioned by the deceased to him, the witness. The witness also denied that he ever told D. Newsom, Doctor McCord. or any one else, that the deceased fired the first shot, and never did anything after the defendant fired. Witness was not drinking the day of the killing, and the deceased was per-

fectly sober. Witness never drank himself, and never saw the deceased take a drink.

T. P. Dowell, for the State, testified that he was sheriff of Wood county at the time George Moore was killed, and, the next day after the killing, he went to arrest the defendant. The defendant was gone from his home. Witness and his deputies searched the neighborhood for him, but failed to find him, though they looked for him several days and nights. Witness sent writs for the defendant in every adjacent county. About a year afterwards the defendant was arrested, and was delivered to witness at Quitman, the county seat of Wood county. With this testimony, and having proved the venue of the offense by the witnesses to the killing, the State rested.

John Chaney was the first witness for the defense. He testified that, about a year before George Moore was killed, he, Moore, in the presence of the witness, let out to cursing the defendant. Witness told him not to abuse the defendant, but he said: "G—d d—n him, I intend to kill him." He specified no time. He was so angry that witness said but little to him. Witness, the next day, mentioned this to the defendant, at the latter's house. Defendant remarked: "I've got a big family, and am in a bad fix to be left," and then went back in his house.

On cross-examination, the witness stated that the defendant was the only person to whom he had ever told the threat of the deceased. Witness was on good terms with both the defendant and the deceased, but knew they were enemies to each other, and had been for a long time. Deceased said that the defendant had annoyed him so much about a yearling which ran at defendant's place, that he, deceased, would put a stop to it. In reply to a direct question respecting his feelings toward the deceased, the witness said he "had nothing particular against him. He (the deceased) was mad at me. He had not spoken to me since that time up to his death. When I met him that time, I expected him to rail out at me." Witness lived in about a mile and three-quarters of Moore, the deceased, when the latter was shot, but did not go to see him, nor attend his funeral.

W. H. Adrain, for the defense, testified that, about six or seven months before the killing, he saw the deceased and the defendant meet in Mineola, and heard the deceased abuse the defendant. Deceased cursed defendant for the lowest scrapings of the earth, and said, "G—d d—n you, you are a d—n convict." Defendant replied, "I am not all to blame; why do you want to

take it all out of me ?" Deceased replied, " D—n you, shut your mouth."

R. M. Chaney, for the defense, testified that he lived about a hundred and fifty yards from the road on which the deceased was killed, and by a diagram made by this witness it appears that it could have been but a few yards farther to the spot at which the killing occurred. When the homicide was done the witness was sitting on his door-step. He heard the wagons as they came up the road, and saw the deceased and Sam. McGehee in the foremost wagon. As they passed on a few steps the witness saw both of them shooting. He could not at that time see the defendant on account of the intervening undergrowth, but, just before he saw the wagons, he observed the defendant riding down a path toward the road. Witness did not see the defendant while the shooting was going on, nor after it ceased. He saw both the deceased and McGehee shoot, but neither saw nor heard the defendant shoot. He thought he saw some one fall, and he remarked to his wife that he believed they had killed Gilly. Witness was a good friend to both Gilly and the deceased, and thought as much of one as the other. The witness explained the diagram he had made, and stated the distances between different localities spoken of in the testimony. About half an hour before the killing, the witness, while on his way home from a neighbor's, met the defendant, who was coming along the main road from the direction of Mineola. Defendant gave witness a drink of whisky out of a quart flask. Defendant was somewhat under the influence of whisky, but was not drunk. He and witness had some talk, in the course of which the defendant said that he left Moore, the deceased, in Mineola. Defendant further said that he had heard that Moore had been threatening him, and that he had a lovely family which he hated to leave. He made no threats remembered by the witness. The only shots seen or heard by the witness were fired by the deceased and McGehee. Witness did not then go to where the shooting occurred, but got on his horse and went over to Ezell's, who lived about two hundred yards distant, and close to the road. In a minute or so after the witness reached Ezell's, McGehee came driving along the road within a few steps of him, and he saw Hugh Moore lying in the wagon. Moore was very bloody, but seemed to be still alive. Witness said nothing to McGehee or Moore, nor they to him. Ambrose George was about twenty-five yards behind them, and as he passed by the witness the lat-

ter asked him where Gilly was, and George replied that Gilly had gone on down the road. Nothing more passed between witness and George. Witness did not go to see Moore, nor did he attend the funeral. Witness worked under Gilly, making ties. He saw no more of Gilly until the latter was arrested and brought back, in 1882.

W. H. Wilson, an employee of the defendant, testified that he heard the shooting when the deceased was killed. The first two reports were those of a large pistol; next came two reports of a shot gun; and the last four shots were those of a small pistol. On his cross-examination, this witness stated that he was expecting the shooting at the time it occurred, because the defendant had just passed up the road along which the deceased and his wagons were returning from Mineola. The witness said he was as friendly to the deceased as to the defendant, but did not go to see the deceased nor attend his burial.

D. A. Sutton, for the defense, testified that in the fall of 1880 he heard the deceased curse and threaten the defendant in Henry's store, at Mineola. Deceased called the defendant a G—d d—n son of a bitch, and the latter asked the deceased who else said so; to which the deceased replied, "Shut your G—d d—n mouth, or I will cut your guts out."

W. T. Burleson, an employee of the defendant, testified that he heard the shooting when the deceased was killed. He was twenty-one years old, and was experienced in the reports of fire arms. The first two were the reports of large pistols. W. H. Wilson (a preceding witness) had just told the witness and the defendant's son Tom that he was expecting a fuss between the defendant and the deceased, because the defendant had gone toward Ezell's with his shot gun, and the deceased had passed along that way. The shooting commenced about the time Wilson told this, and he exclaimed: "There now; I told you so." Witness was a son of Mrs. Tuell, and lived at her house. Being asked if the defendant, after the shooting, got a horse, a gun, a pistol, or any money at Mrs. Tuell's, the witness replied that he did not; but, being then asked if his mother, in his presence, did not give the defendant five dollars to leave on, he answered: "Oh yes! I forgot that; she did let him have some money." Being asked which way the defendant went off, the witness said he went out the back way, in the direction of the Sabine river bottom, toward which there was woods all the way, and no road. Witness was as good a friend to deceased as to

defendant, but did not go to the former's burial, nor did he inform the officers which way defendant had gone, when they were hunting him. Witness considered it none of his business.

W. L. Brown, for the defense, testified that he was between a quarter and a half mile distant when the shooting occurred. The first and second reports were small guns; then came two large ones, and these were followed by some small ones.

John Preston, for the defense, testified that in 1881, after Hugh Moore was killed, he met the State's witness Sam. McGehee, and asked him to state the facts about the killing. McGehee said that he and Moore were going home from Mineola in a wagon, and met the defendant in the road. That defendant had a shot gun, and the deceased drew his pistol, and the first two shots were fired by deceased and him, McGehee. That defendant shot the deceased, and fired at him, McGehee, and he emptied his pistol at defendant as the latter rode off. On cross-examination the witness stated that he informed defendant of this conversation with McGehee, and that he had stayed at defendant's tie camp during this and two previous terms of court.

W. D. Newsom, for the defense, testified that he was at deceased's house the night after the latter was killed, and helped to dress him. After the deceased was dressed, Doctor McCord, George Powers, witness, and the State's witness McGehee went out to the well, and Doctor McCord asked McGehee to tell how the killing occurred. The latter stated that as he and the deceased were coming along the road in a wagon, the defendant rode out from behind, opposite their horses' heads, with a double barreled shot gun presented and both barrels cocked. That the deceased hallooed at defendant not to shoot in the wagon, and jumped to get his pistol, which was buckled up in his saddle bags which were hanging on the front gate of the wagon; but that before deceased got his pistol the defendant shot him, and then fired the other barrel at him, McGehee, striking one of his fingers and perforating his hat. That deceased then succeeded in getting his pistol and fired two shots at the defendant, and, as the latter rode off, he, McGehee, fired four or five shots at him. That, as deceased fired his second shot, his pistol dropped and he fell back on the bed in the wagon, and did nothing more until he died. Witness then remarked to McGehee that the deceased was the worst shot man he ever saw, to do anything after he was shot; to which remark McGehee replied, "Why, man, he did not do anything."

Jeff. Davis, for the defense, testified that the deceased, about six weeks before he was killed, asked him if he knew Mr. Gilly, and witness told him he did not. Then the deceased asked him if he wanted to go to Mineola that day. Witness replied that he did, and the deceased said that he could go if he had the grit to shoot and would carry a pistol. Witness replied that he did not have the grit, and then the deceased said that as witness did not have the grit and did not know Mr. Gilly, he would have to get some of the other boys to go with him. Several days before this conversation the deceased told witness that there was a man in Wood county he intended to kill with his big ivory handled pistol, adding that he had lots of old rusty dollars to get him out of it, and that a man who had plenty of money was hard to beat at law. Witness thought he had not told the defendant about this prior to the killing.

The cross-examination disclosed that the witness, at the time he referred to, was a county convict who had been hired to the deceased to work out a fine for stealing. Witness had often seen defendant before the conversation, and had seen him twice since his arrest. Witness did not tell defendant what he would swear, nor did defendant tell witness he wanted him for a witness. Witness had worked out his fine before the deceased was killed, and had been staying at the defendant's camp during the pending term of the court.

J. T. Davis, for the defense, testified that, when the deceased was killed, he, the witness, was hunting at a distance of about a hundred yards, and not only heard the shooting, but counted the reports. There were nine of them. The first two were big, loud reports, and were the reports of a large pistol; then there was a small pistol report, which was followed by the report of a shot gun. The rest were the reports of a small pistol. Witness was so experienced that he could distinguish between the report of a gun and that of a pistol, every time.

On his cross-examination the witness stated that he had found and was watching an old fox squirrel when the shooting began, and he was not expecting the shooting. Nevertheless, he counted the shots, though they were fired pretty fast. He knew a pistol report from that of a gun, being very used to them. However, he could not tell the difference between the report of a Winchester rifle and that of a pistol; nor between the reports of thirty-two, thirty-eight, forty-two, forty-four and forty-eight calibre pistols. He never owned but one pistol, and that was a

forty-one calibre, and of a make seldom seen in this country. That was the only pistol he was ever used to. Witness had been getting out ties on Mr. Gibson's land. Being asked if he did not tell Mrs. Moore, the deceased's widow, that Gibson had offered him a wagon and team to kill her husband. the witness replied that he had not, but had told her that he could swear that. Being asked if he had not told the same thing to Mrs. Moore's brothers, the Ballard boys, he replied that he had told them that he could swear that Gibson had offered him a wagon and team to kill Moore. All he meant, however, was that anybody could swear a lie if he wanted to.

R. M. Sharp, for the defense, testified that in the fall before Hugh Moore was killed he, the witness, saw Moore coming, in advance of defendant, toward Henry's store, in Mineola. As they came up near where witness was, the defendant said to Moore: '' Let us be friends.'' Moore replied: ''D—d your friendship; I don't want it,'' and walked into Henry's store. Defendant walked into the store at a different door. After a while they came out and met on the sidewalk, and Moore said, ''G—d d—n you, I want you to let me alone.'' and ran his hand in his pocket; and the defendant shrugged his shoulders and said. ''Sold again.'' as though he thought Moore had the advantage of him. Since Moore's death, the witness had had two conversations with the State's witness Ambrose George. In one of them George said that as Moore and Sam. McGehee were driving home from Mineola in front of a wagon he was in, he saw the defendant ride into the road from behind a tree to the head of Moore's horse, with his gun cocked and presented, when Moore said, ''Don't shoot into the wagon;'' and that the defendant immediately shot Moore, and then fired the other barrel of his gun at Sam. McGehee; that Moore then fired two shots out of his pistol at the defendant, and McGehee also fired several shots at defendant as the latter rode off. In the other conversation, George said he first saw the defendant riding down the road toward and in front of Moore's wagon, with his gun cocked and presented, and that Moore did not say anything, but that the defendant immediately shot Moore and fired the other barrel at Sam. McGehee; that Moore then got his pistol and fired two shots at defendant, and Sam. McGehee fired several shots at defendant as the latter rode off.

Tom Gilly, the defendant's son, testified for the defense, that he heard the shooting when the killing occurred, and that he

was experienced in the reports of fire arms, and could distinguish between them. The first two were the reports of large pistols; then there were two shots, one of which was a large and the other a small one; and then there were three small ones. The deceased, two days before he was killed, came to where witness was working in the woods, and asked him where the defendant was. Deceased was armed with a large six shooter. Witness replied that the defendant was at work some distance beyond his tie camp. Deceased said he wanted to settle with defendant. Witness told him that if he would go to defendant's camp and wait, he, the witness, would go and bring the defendant there.' Deceased replied, "No, I'll settle with him the next time I see him," and then rode off. At noon of the same day witness told this to the defendant.

On his cross-examination, this witness stated that he and W. T. Burleson, a previous witness for the defense, were together when they heard the shooting, but denied that' W. H. Wilson was then with them or said anything to them, as testified by Burleson.

William Green, for the defense, testified that in the spring before the deceased was killed, the latter and the witness had a conversation in the presence of Sam. and Bully McGehee. Witness told deceased that the defendant had requested him, the witness, to say to him that he. the defendant, wanted to be friendly with him, and wanted to stop their troubles and fusses. Deceased said: "Tell me no more; I don't want his friendship; I had as soon kill him as a hog." Witness then went down into the plum orchard, and was eating plums when the deceased and Sam. McGehee came as close to him as the width of the court room. They were talking about the defendant, and witness heard the deceased say he would never rest until he had got his revenge and killed the defendant. Sam. McGehee, laughingly, and deviling the deceased, said he had better let the defendant alone or the latter would kill him. Deceased replied that the defendant was not born to kill him, and that he, deceased, would give five hundred dollars to have the defendant killed. Sam., still laughing at and deviling the deceased, said, "You had better give me your five hundred dollars," and the deceased remarked that anybody could get it who would kill the defendant. About this time Sam.'s brother Bully came up and told Sam. to hush up.

On cross-examination, the witness stated that he left the de-

ceased's soon after the occurrences he had related, and was not living with deceased when he was killed; but that he, the witness, never had any special falling out with the deceased. Witness was staying at defendant's camp during the pending term of the court. He did not remember who was the first person he informed of this talk of the deceased, nor when he first told defendant about it. He had known the defendant a long time, and had always been friendly with him.

Ben. Gilly, thirteen years old, and a son of the defendant, testified that he and his little brother went with their father to Mineola the day Hugh Moore was killed. In Mineola the witness was left to watch the wagon, as the team consisted of two young mules. The wagon was stopped close to a blackjack, near Zuckerman's store. While witness was there watching the wagon, the deceased, whom he knew well, came to the wagon, took the defendant's gun, removed the caps, spit in the tubes, and said, "There, G—d d—n him, we have got him now," and then went off. Soon afterwards the defendant came to the wagon and started home. When they got about a mile from Mineola witness told his father what the deceased had done. Defendant said nothing, but took his gun, picked powder into the tubes, and put fresh caps on them. When they got to Mrs. Tuell's, where the road turns out toward defendant's camp, Mr. W. H. Wilson took the wagon on to the camp, and the defendant got on the horse Wilson was riding, and took it to water either at Ezell's or Tuell's.

G. E. Brown, for the defense, testified that about noon on the day of the killing he met the deceased at Zuckerman's store in Mineola. Deceased invited witness to go and take a drink, and they went to the saloon of witness's brother, where witness took a drink of whisky and the deceased a drink of soda water. After they had taken their drinks the deceased told witness that the defendant had stolen a molasses or salt kettle from him, and he intended to kill defendant for it before night; and, showing two boxes of cartridges to the witness, the deceased further said, "That is what I am going to fix him with." Witness told deceased he ought not to tell him that; to which the deceased replied: "I know you; you won't squeal." Then they went back to Zuckerman's store together, and witness went in to get some tobacco, and as he came out he saw deceased go to a wagon standing by a blackjack tree, some thirty or forty steps from the store, and there the deceased unrolled a quilt from around a

shot gun, and took the caps off the gun, and said, "Now we have got him." Witness did not know whose wagon it was. Witness was standing in front of Zuckerman's store when he saw and heard what he had just related.

On his cross-examination the witness was asked to repeat the testimony he had just given in chief. In doing so the witness stated that it was while he and deceased were going to the saloon, and before they reached there, that the deceased said the defendant had stolen from him a molasses or salt kettle, and he intended to kill him before night; and, showing two boxes of cartridges, further said that was what he intended to do it with. After that they went in and got their drinks, and then the deceased went out of the saloon. In a few minutes the witness started back to Zuckerman's store to get some tobacco he had forgotten there, and as he got in front of the store he saw the deceased go to a wagon which was standing thirty or forty steps distant, near a blackjack tree, and take out a gun which was rolled up in a quilt. Witness then walked up near the deceased, and saw him take the caps off the gun, and heard him say, "Now I have got him." There was a little boy either in or near the wagon. The deceased, when he saw the witness, told him that was Gilly's wagon and gun. Then the witness said to the deceased, "You ought not to do and say in my presence what you have said and done," and he replied: "I know you will not squeal." Witness saw everything done by the deceased at the wagon, and was positive that he did nothing to the gun except to take off the caps. Witness told nobody what the deceased had said and done on the occasion he spoke of until, after the arrest of the defendant, he went to the latter's attorney and told him. He was the friend of both the deceased and the defendant. Being asked to make a diagram of the wagon, the tree, Zuckerman's store, etc., he declined to do so, and was unable to place them when asked to do so. Witness was not following anything to make a living.

Several witnesses for the defense testified that the general reputation of deceased was that of a quarrelsome and violent man. Some of them thought he was a dangerous man; the others thought he was not.

In rebuttal of the testimony of R. M. Chaney, one of the defendant's witnesses, the State introduced A. B. Grant, who testified that he was familiar with the locality spoken of by Chaney. At the time of the killing, Chaney's home was a hundred and seventy-five yards from the road, from which a winding footpath

led to the house through thick undergrowth.   There was but one place in the road from which any part of Chaney's house could be seen, and from that place only the top of the house was visible.   No one sitting in Chaney's door could have seen down to the road, by reason of the thick undergrowth.   Since the killing the witness had ridden along there and tried to see the house, and it could not be done.

Witness, on cross-examination, stated that he had never placed a man in the road where the killing was done, and looked from Chaney's door to ascertain if the man could be seen from there; but witness was certain the door of the house could not be seen from the road.

A new trial being refused, the defendant appealed.

*Herndon & Cain,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   Homicide is permitted in the necessary defense of the person:

First.   When inflicted for the purpose of preventing the offense of murder, rape, robbery, maiming, disfiguring, or castration.   (Penal Code, Art. 570.)

Second.   When inflicted for the protection of the person against any other unlawful and violent attack.   (Penal Code, Art. 572.)

In either case, the party whose person is attacked is not bound to retreat in order to avoid the necessity of killing his assailant. (Penal Code, Art. 573.)

Where the homicide is inflicted to prevent murder, rape, robbery, maiming, disfiguring, or castration, the slayer is not required to resort to any other means except killing his assailant to prevent the injury, but may kill at once.   (*Kendall* v. *The State,* 8 Texas Ct. App., 569; *Ainsworth* v. *The State,* 8 Texas Ct. App., 532; *Jordan* v. *The State,* 11 Texas Ct. App., 435; *King* v. *The State,* 13 Texas Ct. App., 277.)   This rule applies also where the homicide is inflicted to prevent *serious bodily injury.* (Penal Code, Art. 574; *Kendall* v. *The State,* 8 Texas Ct. App., 569; *Hill* v. *The State.* 10 Texas Ct. App., 618.)   If, in any case, the attack upon the person of an individual be such as produces a reasonable expectation or fear of death, or some *serious bodily injury,* the person so attacked may act promptly, and slay his

adversary, and is not required to resort to other means to avoid the injury.

Where, however, the attack made, though it be unlawful and of a violent character, yet is not such as to produce a reasonable expectation or fear of death, or of serious bodily harm, then the party assailed must resort to all other means, except retreat, for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack; otherwise, the homicide will not be justiable. (Penal Code, Art. 572; *Kendall* v. *The State*, 8 Texas Ct. App., 569; *Jordan* v. *The State*, 11 Texas Ct. App., 435.)

We have adverted to the distinction made by the law between these two classes of self-defense, for the purpose of more particularly showing that where the attack is made with a weapon, or by means or in a manner such as would be calculated to produce the result of murder, rape, robbery, disfiguring, maiming, or castration, or *serious bodily injury* which might result in either of the offenses named, the party assaulted may kill his assailant without resorting to any other means to avoid the injury; and the rule prescribed by Article 572 of the Penal Code does not apply to such a case.

It is objected, in this case, that the charge of the court upon self-defense is not in accordance with the law as we have above stated it. We are of the opinion that the charge fails to draw clearly and correctly the distinction between the two classes of self-defense, but applies the restrictions of Article 572 to Article 570 of the Penal Code, so as to require the person assaulted, in either class of cases, to resort to all other means to avoid the injury, except that of retreat or killing the assailant. In this respect, we think, the otherwise excellent charge of the learned judge was abstractly erroneous.

But no exceptions were made by defendant to the charge of the court when it was delivered to the jury, nor did the defendant request any additional instructions, or in any manner call the attention of the court to any defect or insufficiency in the charge at the time of the trial. In his motion for a new trial, however, the defendant assigns as grounds for his motion, that the court failed to charge all the law of the case; failed to charge the law of manslaughter; erred in charging the law of self-defense, etc. Whatever errors or defects there may be in the charge, they are not sufficient to cause a reversal of the conviction, unless they be of that character, which, in our opinion, might have preju-

diced the rights of the defendant upon the trial, the charge, as before stated, not having been excepted to on the trial. (Code Crim. Proc., Art. 685; *Bishop* v. *The State*, 43 Texas, 390.)

We have carefully examined the evidence upon which the conviction in this case is based, and with reference to which the charge of the court was formed, and we are clear in our conclusion that there is no error in the charge of the court which could have resulted to the prejudice of the defendant. We think the charge of the court was more favorable to him than the evidence warranted. The evidence, as shown in the statement of facts, proved beyond all reasonable doubt that the homicide was murder in the first degree. There was no room for even a probability that it was manslaughter, or even murder in the second degree. Nor was there any evidence fairly raising, or tending to raise, the issue of self-defense. We think the learned judge had fully instructed the jury upon the law of the case when he had explained to them the law of murder in the first degree. We would not have reversed the judgment if he had omitted entirely to charge upon murder in the second degree and self-defense, because in our opinion the facts of the case as presented to us did not demand these charges. It was favorable to the defendant, however, that such charges were given, and he has no cause to complain that he has had advantages accorded to him in his trial which he was not strictly entitled to under the law.

We have found in the record no material error, and, believing the conviction to be in due form of law and amply sustained by the evidence, and a just retribution for the deliberate murder committed by the defendant, the judgment is affirmed.

*Affirmed.*

Opinion delivered December 14, 1883.